## WALKER et al. v. LANE. (No. 9553.)

(Court of Civil Appeals of Texas. Fort Worth.
April 9, 1921. Rehearing Denied
May 14, 1921.)

Mines and minerals ⊜⟹78(5) — Extensions of
time for beginning of oil well constituted estoppel of original lessor.

Extensions of time for the beginning of an
oil and gas well, made by the original lessor in
conjunction with other joint owners of the
land, sublet by the original lessee, *held* to have
constituted an estoppel of the original lessor to
claim in equity that the lease on his land which
was not sublet was terminated by reason of the
failure of the original lessee and his codefendants to begin a well or pay rentals on such land
within the first year of the life of the lease,
or, at all events, within the six-month period
provided for in the first extension agreement.

Appeal from District Court, Palo Pinto
County; J. B. Kirth, Judge.

Suit by J. M. Lane against B. B. Walker
and others. From judgment for plaintiff,
defendants appeal. Judgment reversed, and
rendered for defendants.

Penix & Miller and W. L. Dean, all of
Mineral Wells, for appellants.

Ritchie & Ranspat and T. P. Perkins, all of
Mineral Wells, for appellee.

DUNKLIN, J. J. M. Lane and wife, Lucy
Lane, and A. B. Lane executed what is usually termed an oil and gas lease to B. B.
Walker, on 1,602 acres of land situated in
Palo Pinto county. The lease was dated
February 21, 1917, and recited a cash consideration paid by the lessee of $1,602, and the
further consideration of the covenants of the
lessee therein contained. It stipulated that
it should continue in force for a period of 10
years and as much longer thereafter as either
oil or gas shall be produced therefrom in paying quantities, and that the lessors should
receive, as royalties, one-eighth of all oil
produced from the land and a stipulated sum
for the gas from each well in which gas might
be found. It contained the further stipulation that if operations for drilling a well
should not be commenced on the land on or
before February 21, 1918, the lease would
terminate, unless the lessee should pay to the
lessors $1,602, which would operate and be
accepted as a rental for the next succeeding
year, and that by paying a like rental before the beginning of each succeeding year
the lessee should have the right to continue
the lease in force for the full 10-year period
without drilling a well. The lease contained
this further stipulation:

"The lessee shall have the right to assign
this lease, or any portion of the acreage covered thereby, in which last event the lessee
shall be liable only for royalties accruing from

operations on the acreage retained, and be liable only for such proportions of the rentals
due under said lease as the acreage retained
by the lessee bears to the entire acreage covered by said lease and the assigns of the lessee
shall have corresponding rights and privileges
with respect to said royalties and rentals as
to the acreage so assigned."

On February 5, 1918, B. B. Walker, the
lessee, transferred and assigned to J. E.
Whiteside all rights and interests he acquired under the lease, in and to two tracts
covered by the instrument, aggregating 800
acres. The consideration for said assignment, as recited therein, was $1 cash paid
and certain covenants and agreements which
were not mere options, and some of which
were as follows:

"As a part consideration hereof, grantee
agrees to begin the operations for drilling a
well on the above-described premises before
the 21st day of February, 1918, and that grantee will continue in good faith to sink said well
to the productive sand, in what is known as
the productive sand of the Caddo field, unless
oil or gas is discovered in paying quantities
at a lesser depth.

"Grantee agrees to pay all royalties provided
for in said Lane lease and assume the conditions thereof so far as same applies to the land
hereinabove described.

"It is understood that the said grantor herein is to have an undivided one-sixteenth $(1/16)$
interest without cost to him in the first well
drilled on said premises and is to have a $1/16$
interest in all wells drilled thereon thereafter
after all expenses of drilling, completing and
making same ready for production is paid."

J. M. Lane, who was the sole owner of the
tracts, the lease on which Walker did not
assign to Whiteside, instituted this suit
against B. B. Walker and the Banker's Oil &
Refining Company and the Banker's Oil Company, to whom the lease on those tracts was
transferred by Walker, to cancel the lease
as to those tracts. From a judgment in favor
of plaintiff decreeing the cancellation prayed for, the defendants have appealed.

No drilling was done on any part of the
land covered by the lease during the first
year, and no rentals have ever been paid by
any of the defendants on the 800 acres which
defendant Walker retained. But plaintiff,
Lane, joined by his wife and A. B. Lane, executed and delivered to Whiteside, Walker's
assignee, the following extension agreements,
and received from him the considerations
therefor recited in those agreements:

"State of Texas, County of Palo Pinto.

"Know all men by these presents that
whereas A. B. Lane, J. M. Lane and Lucy Lane
did execute and deliver to B. B. Walker a certain oil, gas and mineral lease of date the 21st
day of February, A. D. 1917, on certain tracts,
parcels of land laying, being and situate in Palo
Pinto and Stephens counties, Texas, fully described in said lease; and,

"Whereas, the said B. B. Walker duly assign-ed by this instrument in writing to J. E. White-side of Muskogee, Oklahoma, his interest in said oil, gas and mineral lease, on the following ·described tracts of land, to wit:

"First tract: One hundred sixty (160) acres of land, the N. W. one-fourth (¼) of the S. E. one-fourth (¼) and the S. E. one-fourth (¼) of the S. W. one-fourth (¼) of survey No. 11, block 4, and the N. E. one-fourth (¼) of the S. E. one-fourth (¼) and the S. W. one-fourth of the S. E. one-fourth (¼) of said section 11, block 4.

"Second tract: All of section No. 14, block No. 4, T. & P. Ry. Co., containing 640 acres, more or less, and as part consideration for said assignment, the said J. E. Whiteside agreed ·to drill a' well on said premises; and

"Whereas, owing to the various conditions arising out of transportation brought about by the present war that is now existing, it was impossible for the said J. E. Whiteside to commence the actual drilling of said well by the 21st day of February, 1918, and it was only possible to begin the operations for the drilling of said well by said time:

"Now, therefore, in consideration of the premises and further consideration of eight hundred dollars ($800.00) cash in hand paid by J. E. Whiteside, the receipt of which is hereby acknowledged and confessed, we, the said A. B. Lane, J. M. Lane and Lucy Lane, do hereby extend the time for the actual beginning of the drilling of said well for six months from and after this date, and extend the conditions and provisions of said lease for said period of time.

"Witness our hands this 19th day of March, A. D. 1918.          [Signed]  A. B. Lane,
                                "J. M. Lane.
                                "Lucy Lane."

"Caddo, Stephens County, Texas,
                          August 5, 1918.

"This memorandum of agreement made and entered into this fifth day of August, 1918, by and between J. M. Lane, A. B. Lane and Mrs. J. M. Lane, parties of the first part, and Jas. E. Whiteside party of the second part, that, for the consideration of two hundred ($200.00) dollars, the receipt of which is hereby acknowledged, does hereby grant to the party of the second part an extension of forty (40) days time from the 21st day of August, 1918, to commence the drilling of a well and if the same is not commenced then said extension is dead.
          "[Signed]  J. M. Lane.
                    "A. B. Lane.
                    "Mrs. J. M. Lane."

The drilling of a well was begun by Whiteside on September 28, 1918, which was within the 40-day extension provided for in the last extension agreement. But no well was ever begun on the land reserved by Walker.

In his original petition plaintiff alleged that no well was begun on the land retained by Walker during the first year of the lease, and that no rentals were paid prior to the expiration of that year for the next succeeding year, and those facts were urged as one of the grounds for the cancellation sought. In their answer defendants pleaded the two ex-

tension agreements copied above as estoppels against plaintiff to claim the cancellation sought, alleging, in substance, that they were made with full knowledge of Whiteside's contract with Walker and the benefits to accrue to the latter by its performance. By supplemental petition, plaintiff pleaded that the second extension agreement with Whiteside was made with the express understanding, by and between the parties thereto, that the same should apply only to the land that had been sublet to Whiteside by Walker, and should be without prejudice to plaintiff's right to cancel the lease as to the land retained by Walker for noncompliance with the conditions and stipulations contained in the original lease executed to him. And in answer to a special issue the jury found the facts to be as so pleaded by the plaintiff, but there was no pleading nor finding by the jury that the first extension agreement was executed with such an understanding and reservation on the part of plaintiff. But in his supplemental petition plaintiff did plead and the jury found that Whiteside did not begin a well within the six-month period allowed in the first extension agreement, and that for that further reason the lease on the land retained by Walker had lapsed.

Whether or not the extensions of time for the beginning of a well, so made by the plaintiff in this suit in conjunction with the other joint owners of the land sublet to Whiteside, but with the intention and understanding with respect to the second extension pleaded by plaintiff and found by the jury, constituted an estoppel of plaintiff to claim, in a court of equity, that the lease on his land which was not sublet to Whiteside was terminated by reason of the failure of Walker and his codefendants to begin a well or pay rentals on that land within the first year of the life of the lease, or, at all events, within the six-month period provided for in the first extension agreement, is the controlling question to be determined on this appeal; and we have concluded that it should be answered in the affirmative.

Walker, the original lessee, had the right to procure the drilling of a well by some person other than himself, and the performance of the contract he obtained from Whiteside would have inured to his benefit in preserving the lease in full force and effect as to the 800 acres retained by him, and that expected benefit was a material consideration which induced him to sublet to Whiteside 800 acres of his lease; and that contract was likewise for the benefit of the lessors. In fact, the development of their land for oil and gas production was one of the material, if not the most material, object or inducement which moved them to execute the lease. The evidence shows without controversy that plaintiff and the other lessors knew of the assignment of the 800 acres of the original

lease and of the contract made by Whiteside to drill the well, and that they acquiesced in and ratified it by extending the time for its performance according to its terms, knowing also that Walker had retained 800 acres of the land leased to him out of which he expected a profit from a fulfillment by Whiteside of his contract to drill a well on the remaining 800 acres, and that such expected profit was a material consideration which induced Walker to sublet 800 acres of his original lease to Whiteside. Instead of asserting their right to cancel the lease in its entirety after they discovered that Whiteside would not be able to begin the well before the expiration of the first year of the lease term, they elected to extend the one already made with Walker. They, as well as Walker, were beneficiaries of the original contract, and they could not in equity accept the benefits accruing to them under it and deny to Walker the benefits likewise due him under the same contract. They could not accept and ratify the contract, in so far as the same was beneficial to them, and reject the rest that was for Walker's benefit. Bigelow on Estoppel, p. 744 et seq.; 2 Black on Rescission & Cancellation, §§ 594, 595; 21 Corpus Juris, p. 1206.

The jury found further that Walker knew of the making of the second extension agreement, and the understanding and intention of the parties thereto, as pleaded by plaintiff prior to September 19, 1918, which was the date the six-month extension provided for in the first extension agreement expired, and a few days before Whiteside began to drill the well, and that he was not induced by the same to forego commencement of drilling operations himself, or to omit the payment of rentals on the 800 acres retained by him. But there was no finding nor contention made by plaintiff that either Walker or any of the defendants was a party to those extension agreements.

The merits of the defense of the estoppel invoked against plaintiff's suit for cancellation did not depend on a showing that defendants were misled to their injury by reason of either or both of the extension agreements made by plaintiff with Whiteside. In the absence of such a showing those agreements made with plaintiff's knowledge of defendants' rights, as stated, had the effect to estop the plaintiff from claiming the cancellation sought, under the doctrines announced in Bigelow on Estoppel (6th Ed.) p. 732, as follows:

"A party cannot, either in the courts of litigation or in dealings pais, occupy inconsistent positions. Upon that rule election is founded. 'A man shall not be allowed,' in the language of the Scotch law, 'to approbate and reprobate.' And where a man has an election between several inconsistent courses of action, he will be confined to that which he first adopts. The election, if made with knowledge of the facts, is in itself binding—it cannot be withdrawn without due consent; it cannot be withdrawn though it has not been acted upon by another by any change of position."

And again on page 744:

"So also one who accepts the terms of a deed or other contract must accept the same as a whole; one cannot accept part and reject the rest. Thus, a party actively affirming a transaction such as a contract or a purchase, by receiving and retaining money upon it, is estopped thereafter to deny the force of any of its express or implied terms or conditions."

See, also, Pryor v. Pendleton, 92 Tex. 384, 47 S. W. 706, 49 S. W. 212; Mitchell v. Porter, (Com. App.) 223 S. W. 197; Rogers v. Trevathan, 67 Tex. 406, 3 S. W. 569; Mayo v. Tudor, 74 Tex. 471, 12 S. W. 117; Davis v. Mitchell, 225 S. W. 1117; Simkins on Equity, p. 668; 16 Cyc. 791; 40 Cyc. 1895.

In Pryor v. Pendleton, 92 Tex. 384, 47 S. W. 706, 49 S. W. 212, cited above, it was held that a daughter who had by an instrument in writing recognized the assumed right of her father to devise the community property of himself and his deceased wife, who had died intestate, was estopped thereafter to claim as heir of her mother a different interest from that devised to her by her father, although it appeared that she had executed the instrument with the understanding that she did not thereby intend to waive her right to claim the interest in the community estate which she had inherited from her mother. And it further appeared in the opinion on the original hearing that other devisees who invoked the estoppel had not been misled to their injury by reason of the act upon which the plea of estoppel was based.

There is a distinction between waiver and estoppel, although the distinction is often difficult to determine, and the two terms are frequently used in the same sense. It is said that intention to waive is one of the essential elements of waiver, as distinguished from estoppel. But that is not true of the character of estoppel invoked in this suit which is sometimes designated in the authorities as estoppel at law, or quasi estoppel, as distinguished from estoppel in pais under the strict rules of equity; and the fact that plaintiff did not intend to waive his right of cancellation as against Walker when he executed the second extension agreement did not exempt him from the operation of the estoppel pleaded. And the same could have been said of the first extension if plaintiff had alleged and proved that it likewise was executed with the same understanding and intention on his part, although there was an absence of such pleading and proof. 16 Cyc. pp. 754 to 795; 40 Cyc. pp. 255 to 263; Simkins on Equity, p. 668; Pryor v. Pendleton, 92 Tex. 384, 47 S. W. 706, 49 S. W. 212; 40 Cyc. 1895.

For the reasons noted, the judgment of the trial court is reversed, and judgment is here rendered for appellants.